

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>LUIS LEE,<br><br>*Defendant*. | Case No. 3:24-cr- 030<br><br>18 U.S.C. § 1349<br>Conspiracy to Commit Wire Fraud<br>(Count 1)<br><br>Forfeiture Allegation |

### CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES THAT:

### INTRODUCTORY ALLEGATIONS

1. In or about July 2019, the defendant, LUIS LEE ("LEE"), began working at Company A as a Senior Financial Analyst. LEE was promoted to Treasury Manager in or about October 2022.

2. In or about May 2019, a co-conspirator ("CC-A") began working as the Chief Financial Officer ("CFO") of Company A. CC-A recruited LEE to join Company A in part because the two individuals had worked together previously.

3. Company A is a behavioral health services provider headquartered in Fredericksburg, Virginia. Company A operates counseling and therapy programs, a foster care program, and programs focused on autism and intellectual and developmental disabilities. Company A has approximately 4,500 employees, and it operates in approximately 18 states and the District of Columbia.

1

4. As the CFO of Company A, CC-A was responsible for planning, controlling, and directing the fiscal and information technology operations for the business. CC-A oversaw budgeting, accounting, purchasing, payroll, facilities, audit, revenue management, and reimbursement, among other aspects of the company. CC-A reported directly to Company A's Chief Executive Officer and had at least seven employees as direct reports.

5. As Senior Financial Analyst and Treasury Manager, LEE was responsible for monitoring Company A's bank accounts and payment processing, ensuring quality standards with third-party vendors, conducting risk and cash flow forecasting, and working with internal and external auditors, among other responsibilities.

6. LEE and CC-A both resided in New York and routinely worked remotely during their tenures at Company A. LEE and CC-A often traveled to Company A's headquarters in Fredericksburg, Virginia to carry out their duties.

7. Company A terminated its employment of the defendant and CC-A in or about December 2022 after discovering that the defendant and CC-A had misappropriated funds from Company A. Around the same time, Company A engaged an outside law firm and an independent accounting firm to conduct an internal investigation of the defendant's and CC-A's misappropriation of funds. The primary purpose of the internal investigation was to benefit Company A's business operations by determining the defendant's and CC-A's means of misappropriation, identifying lost funds, and improving accounting controls and procedures. Company A paid approximately $170,386 for professional services related its internal investigation of the defendant's and CC-A's misconduct.

## COUNT ONE
### Conspiracy to Commit Wire Fraud

8. The preceding paragraphs are incorporated herein.

9. From in or about March 2020 through in or about December 2022, in the Eastern District of Virginia and elsewhere, the defendant, LUIS LEE, knowingly and unlawfully conspired with CC-A and others known and unknown to commit an offense contained within Chapter 63 of Title 18 of the United States Code, to wit: Wire Fraud, that is, to knowingly devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States, Code, Section 1343.

### Purpose of the Conspiracy

10. The purpose of the conspiracy and the scheme and artifice to defraud was for CC-A and LEE to fraudulently obtain funds from Company A to which they were not entitled.

### Ways, Manner, and Means of the Conspiracy

11. The ways, manner, and means by which CC-A and LEE sought to accomplish the conspiracy operated in substance as follows:

A. *Use of Fictitious Vendor, JKemp Consulting LLC*

　i. Between in or about March 2020 through in or about April 2021, CC-A and LEE caused Company A to pay approximately $1,140,000 to a fake vendor called JKemp Consulting LLC (hereafter "JKemp"). CC-A and LEE were the beneficial owners of and controlled JKemp.

　ii. JKemp never provided services or goods to Company A. CC-A and LEE created JKemp as a shell entity to facilitate the misappropriation of funds from Company A. Company A personnel, other than CC-A and LEE, were not aware of the fraudulent

3

business relationship with JKemp. Likewise, CC-A and LEE concealed from other Company A leadership that CC-A and LEE were the beneficial owners of and controlled JKemp.

    iii.    CC-A and LEE incorporated JKemp Consulting LLC on or about March 23, 2020 in the state of Delaware. On or about March 26, 2020, CC-A created an email account with the address jkempconsultingllc@gmail.com. LEE opened a business checking account for JKemp at Wells Fargo on or about March 30, 2020. LEE was the sole signatory on the JKemp Wells Fargo account. No one other than CC-A and LEE had an interest in or control over JKemp, and JKemp's sole source of income was its fraudulent receipt of funds from Company A.

    iv.    CC-A drafted a fraudulent engagement letter dated March 2, 2020 purporting to reflect an agreement between JKemp and Company A in which Company A agreed to pay JKemp $100,000 per month in exchange for "various strategic and consulting services." The fraudulent engagement letter bore the signature of CC-A, purportedly on behalf of Company A, and an individual claiming to be "James Kemp," on behalf of JKemp. Company A did not authorize CC-A to enter this agreement on behalf of Company A.

    v.    On or about March 26, 2020, CC-A drafted the first fraudulent invoice from JKemp to Company A for $100,000. On that day, CC-A sent the fraudulent engagement letter and the first fraudulent invoice from the jkempconsultingllc@gmail.com email account to CC-A's Company A email address. CC-A then forwarded the fraudulent documents to two of his direct reports in Company A's accounting department to process. In the email attaching the fraudulent documents, CC-A directed his employees to "cut the

check today [so] I can hand deliver it to him during this weekend [sic] meeting." In truth and in fact, CC-A did not meet with any representative of JKemp that weekend.

vi.     CC-A continued to submit fraudulent JKemp invoices, usually once a month, until in or about April 2021. In total, CC-A drafted and submitted 12 fraudulent JKemp invoices, each of which his employees processed for payment in accordance with CC-A's instructions. LEE was responsible for processing wire transfer payments for some of the fraudulent invoices, which LEE knew full well were fraudulent. The fraudulent invoices are summarized below.

| JKemp Fraudulent Invoices ||
| --- | --- |
| Submission Date (on or about) | Amount (approximate) |
| 3/26/2020 | $100,000 |
| 4/22/2020 | $100,000 |
| 5/25/2020 | $100,000 |
| 8/7/2020 | $100,000 |
| 8/12/2020 | $100,000 |
| 9/12/2020 | $100,000 |
| 12/9/2020 | $60,000 |
| 1/12/2020 | $80,000 |
| 1/21/2021 | $120,000 |
| 2/26/2021 | $100,000 |
| 3/24/2021 | $80,000 |
| 4/21/2021 | $100,000 |
| TOTAL | $1,140,000 |

vii.     After Company A issued payments based on the fraudulent JKemp invoices, CC-A and LEE divided the proceeds between themselves for their own personal benefit.

viii. For example, on or about March 30, 2020, a Company A check for $100,000, constituting Company A's payment for the first fraudulent JKemp invoice, was deposited into the JKemp Wells Fargo account. A few days later, CC-A deposited a $70,000 check from the JKemp Wells Fargo into CC-A's personal checking account at TD Bank.

ix. Similarly, on or about August 25, 2020, LEE deposited a $25,000 check written from the JKemp Wells Fargo account into LEE's personal checking account at Chase Bank.

B. *LEE Tuition Reimbursement*

i. CC-A and LEE further sought to accomplish the purposes of the conspiracy by fraudulently obtaining approximately $177,962 in tuition reimbursements from Company A for LEE's purported enrollment in Hofstra University's Master of Business Administration program. In truth and in fact, LEE never enrolled in Hofstra's MBA program.

ii. Company A allowed employees to seek reimbursement for certain approved educational expenses. Under Company A policy and practice, employees seeking reimbursement must first receive approval from their management to obtain a maximum reimbursement of $5,250 per year.

iii. Between in or about November 2020 through in or about December 2022, CC-A drafted false documentation bearing Hofstra's logo that purported to reflect LEE's attendance in Hofstra's MBA program. On approximately four occasions, CC-A sent this false documentation to LEE and directed LEE to finalize fraudulent reimbursement requests for Company A to process. As instructed, LEE submitted the fraudulent

reimbursement requests, which CC-A and LEE knew full well falsely stated that LEE attended Hofstra's MBA program.

    iv.    Company A believed the tuition requests and supporting documents to be true and accurate, and it therefore issued the reimbursements.

| LEE Fraudulent Tuition Reimbursement Requests ||
| --- | --- |
| Submission Date (on or about) | Amount (approximate) |
| 12/17/2020 | $5,250 |
| 2/19/2021 | $5,250 |
| 1/25/2022 | $5,250 |
| 11/29/2022 | $162,212 |
| TOTAL | $177,962 |

    v.    Company A issued the final fraudulent reimbursement of $162,212—which was far above the $5,250 reimbursement threshold—because CC-A directed an employee in his department ("Employee 1") to process the reimbursement request. LEE's reimbursement request included fraudulent supporting documentation, drafted in part by CC-A, that indicated LEE was entitled to a tuition reimbursement of $100,829.

    vi.    On or about November 29, 2022, CC-A directed Employee 1 to "gross up" the reimbursement payment to approximately $162,212 so that LEE would receive the full amount requested after taxes and other deductions. In other words, CC-A directed that Company A pay LEE approximately $162,212, of which approximately $61,383 would be withheld from LEE as taxes and deductions, leaving the conspirators with a net payment of $100,829 from Company A.

  vii.  Employee 1 processed the fraudulent payment of approximately $162,212 as directed by CC-A. LEE received a $100,829 deposit from Company A in his personal checking account associated with this fraudulent tuition reimbursement request on or about December 2, 2022. On or about December 5, 2022, LEE sent a wire transfer of approximately $86,000 to CC-A's personal checking account. On or about that same day, CC-A paid more than $84,000 toward the mortgage on his personal residence.

C.  ***LEE Vacation Payout***

  i.  CC-A and LEE further sought to accomplish the purposes of the conspiracy by fraudulently submitting, in or about April 2022, an approximately $6,000 reimbursement request seeking compensation associated with LEE's purportedly unused vacation time.

  ii.  Company A corporate policy provided employees with a set allotment of vacation hours each year and allowed employees to carry over 40 hours of unused vacation time from year to year. The policy further stated that "[e]mployees who do not use their allotted vacation time . . . each year will lose all but 40 of those unused vacation hours." The policy added that "[u]nused, earned and accrued vacation hours . . . will not be paid out at the time of separation from employment with the company, unless required by the respective state law." Company A policy did not permit employees to receive payment for unused vacation hours unless specifically provided for under state law at the time of an employee's separation from the company.

  iii.  On or about April 8, 2022, CC-A directed an employee in his department to "pay out [LEE's] entire vacation balance on the next payroll." The employee processed the payment as directed by CC-A, resulting in Company A paying LEE approximately

8

$6,000. Company A policy did not authorize either CC-A's directive to pay out LEE's unused vacation hours or LEE's subsequent receipt of these funds. No Company A executive other than CC-A was aware of or approved the $6,000 payment to LEE for unused vacation time.

12. In total, CC-A and LEE misappropriated approximately $1,323,962 from Company A through the manner and means of the conspiracy described above. CC-A received, directly or indirectly through LEE, the great majority of funds misappropriated from Company A through the conspiracy.

### Wirings in Furtherance of the Scheme

13. In the Eastern District of Virginia and elsewhere, for the purposes of executing the above-described scheme, CC-A and LEE knowingly and routinely caused to be transmitted by means of wire communication in interstate commerce signs, signals, and writings, including those described below.

| Date (on or about) | Interstate Wire Communication |
| --- | --- |
| 9/14/2020 | Wire transfer initiated by Company A from its Bank of America account via the Federal Reserve's Fedwire Funds Transfer System ("Fedwire") to the JKemp Wells Fargo account. |
| 3/24/2021 | Wire transfer initiated by Company A from its Bank of America account via Fedwire to the JKemp Wells Fargo account. |
| 4/21/2021 | Wire transfer initiated by Company A from its Bank of America account via Fedwire to the JKemp Wells Fargo account. |
| 12/2/2022 | Wire transfer of Company A's payment, via Automated Clearing House ("ACH"), to LEE's personal bank account for a fraudulent reimbursement request. |

(In violation of Title 18, United States Code, Section 1349.)

## FORFEITURE ALLEGATION

14. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, the defendant is hereby notified that if convicted of the offense charged in Count One of this Information, he shall forfeit to the United States any property, real or personal, which constitutes or is derived from any proceeds traceable to the offense.

15. Property subject to forfeiture includes, but is not limited to:

> The sum of at least $1,323,962, which represents the amount of proceeds the offenses charged in Count One, which sum shall be reduced to a money judgment against the defendant in favor of the United States.

16. If the property subject to forfeiture cannot be located, the United States will seek an order forfeiting substitute assets.

(In accordance with Title 18, United States Code, Section 981(a)(1)(C), as incorporated by Title 28, United States Code, Section 2461 and Title 21, United States Code, Section 853(p).)

Respectfully submitted,

Jessica D. Aber
United States Attorney

Date:  March 1, 2024          By:  _____
                                    Robert S. Day
                                    Assistant United States Attorney


                              By:  _____
                                    Thomas A. Garnett
                                    Assistant United States Attorney